IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARREN DOOMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3497-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Darren Dooms seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title XVI of the Social

Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) failing to give controlling

weight to the opinion of Michael Ball, D.O., (2) failing to provide a specific bridge between the

residual functional capacity and the medical evidence, and (3) improperly finding plaintiff's

subjective complaints not credible.  I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's motion for

summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.*     *BACKGROUND*

On April 29, 2010, plaintiff applied for disability benefits alleging that he had been

disabled since December 24, 2007.  Plaintiff's disability stems from degenerative disc disease of

the lumbar spine status post surgery, generalized anxiety disorder, depression, and alcohol

abuse.  Plaintiff's application was denied initially on August 5, 2010:

> Claimant is a 46 year old male with allegations of broken back, difficulty walking,
> moving and lifting, constant pain, and depression.  MER [medical records] indicates
> that claimant sustained an L4 burst fracture on a 12/07 MVA [motor vehicle accident]
> while in the process of stealing a car.  He has a history of alcohol and drug abuse.  He
> also has a history of medical non-compliance and drug seeking behavior per Dr.
> Dryden.  The claimant has not returned his ADL/3369 [activities of daily living form].
> In a phone conversation with claimant on 7/12/10, he noted that he thought he had
> sent the forms in.  The forms were resent to him and he stated he would return them

ASAP.  As of 8/5/10, claimant still had not returned the forms.  Claim will be denied for insufficient evidence due to failure to cooperate.

(Tr. at 44).

On October 18, 2011, a hearing was held before an Administrative Law Judge.  On July 15, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 21, 2012, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the

decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A.      ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1978 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1978 | $ 2,074.58 | 1995 | $ 202.31 |
| 1979 | 0.00 | 1996 | 11,338.68 |
| 1980 | 0.00 | 1997 | 0.00 |
| 1981 | 1,224.30 | 1998 | 0.00 |
| 1982 | 1,898.63 | 1999 | 382.72 |
| 1983 | 0.00 | 2000 | 0.00 |
| 1984 | 6,085.86 | 2001 | 0.00 |
| 1985 | 28.00 | 2002 | 6,261.94 |
| 1986 | 130.71 | 2003 | 5,453.38 |
| 1987 | 992.56 | 2004 | 0.00 |
| 1988 | 589.40 | 2005 | 0.00 |
| 1989 | 5,837.94 | 2006 | 17,185.86 |
| 1990 | 1,641.60 | 2007 | 10,451.60 |
| 1991 | 0.00 | 2008 | 0.00 |
| 1992 | 0.00 | 2009 | 0.00 |

| 1993 | 3,115.62 | 2010 | 0.00 |
| 1994 | 4,520.02 | 2011 | 0.00 |

(Tr. at 106-107).

## Application

In his application, plaintiff noted that he lived only with his father, who is disabled (Tr. at 100).

## B.    SUMMARY OF MEDICAL RECORDS

On June 1, 2007, plaintiff was admitted to Ozarks Medical Center after suspicions he had overdosed on methadone, alcohol, and possibly other drugs (Tr. at 178-184). He admitted to long-term intermittent binge drinking and alcoholism, and also said he had recently been overusing prescription medication. Plaintiff denied any history of psychiatric hospitalization. Although he claimed to have once had a fractured neck, a recent MRI of his neck was normal (Tr. at 179).

December 24, 2007, is plaintiff's alleged onset date. On that day plaintiff was injured while attempting to steal a car (Tr. at 211, 226). "He was apparently in the process of stealing a car and was in the getaway car when he had a motor vehicle accident about 9 o'clock last night. He hit a tree. He was found to have facial fractures and an L4 burst fracture and was noted to have a previous lumbar fusion from L5-S1." Plaintiff was noted to be a smoker and an alcohol abuser.

Plaintiff underwent a spinal fusion of L2 through S1 on December 26, 2007 (Tr. at 219-235). While in recovery, plaintiff participated in a comprehensive rehabilitation program which included physical, occupational, and speech therapy, and a neuropsychological consultation. When he was discharged in early January 2008, plaintiff's medications had been discontinued and he was able to move independently.

On January 21, 2008, plaintiff sought treatment for back pain at Ozarks Medical Center and was prescribed Tramadol (Tr. at 372-374).

On January 24, 2008, plaintiff had a follow up at St. John's Spine Center (Tr. at 235). Plaintiff reported that he continued to have a lot of pain. "He is out of his pain medication." On exam, plaintiff was noted to be in no acute distress. He had normal mood and affect, he was awake, alert and oriented. He was able to ambulate without difficulty. He had good strength and reflexes. He was noted to be "doing well." Dr. Lee prescribed a muscle relaxer and talked to plaintiff about "a good walking exercise program." Plaintiff had no further medical records for the next year -- January 2008 through January 2009.

From January 2009 through March 2010, plaintiff was incarcerated and received his care through the Missouri Department of Corrections (Tr. at 254-353).

On January 16, 2009, plaintiff reported back pain to his correctional facility health provider (Tr. at 256); he was prescribed Naprosyn (non-steroidal anti-inflammatory), analgesic balm and strengthening exercises.

On March 2, 2009, plaintiff reported he was experiencing muscle spasms radiating to the back of his left thigh (Tr. at 261-262). His gait was observed to be steady, he was able to bend forward at the waist 40 degrees. "[A]cted normal, did have grimacing while bending over." Plaintiff was able to remove his shoes and walk heel and toe. A referral to the prison doctor was made.

On April 1, 2009, plaintiff was seen by a prison medical staff member (Tr. at 262-263). He continued to smoke, and it was noted that he had a history of drug abuse and alcohol abuse. Plaintiff was encouraged to exercise and stop smoking.

On April 6, 2009, plaintiff was seen for chronic back pain (Tr. at 267-268). His muscle strength was normal, his hamstrings were normal, he had no muscle spasms or point

tenderness in his spine. He had an abnormal gait, abnormal straight leg raise test, and reduced range of motion. He was assessed with low back pain.

On April 27, 2009, plaintiff complained of back pain that had continued since his surgery in 2007 (Tr. at 272-273). "Laying" was noted to be an aggravating factor. Plaintiff had no muscle spasms in his extremities. His complaints were referred to the prison physician.

On April 30, 2009, plaintiff saw the prison doctor, Robert G. Smith, who observed that plaintiff's gait was abnormal, his muscle strength was abnormal, his range of motion was reduced (Tr. at 274-275). Plaintiff was assessed with low back strain. He was told to "return to normal activity" and stop smoking. Plaintiff was given acetaminophen (Tylenol) up to 4 grams per day and was prescribed Gabapentin (for nerve pain) and Amitriptyline (antidepressant).

On May 6, 2009, May 10, 2009, and May 11, 2009, plaintiff refused his Amitriptyline (Tr. at 276, 278, 279). On May 12, 2009, he requested that his Amitriptyline be discontinued (Tr. at 279).

On June 8, 2009, plaintiff saw the prison doctor (Tr. at 283-285). He reported pain radiating down his leg and said his pain increases with movement or position change. The doctor observed that plaintiff's gait was steady and he had equal strength in his extremities, but noted that plaintiff had difficulty with bending, stooping and standing for long periods of time. Plaintiff was assessed with "acute" back pain; however, no treatment is listed.

On June 12, 2009, plaintiff refused Amitriptyline (Tr. at 285). On June 29, 2009, plaintiff had an appointment with the prison doctor but failed to show (Tr. at 289-290).

During a medical visit on July 11, 2009, plaintiff was told to stop smoking and to exercise (Tr. at 293-294).

On September 23, 2009, plaintiff saw the prison doctor for an unrelated reason and was listed as a smoker (Tr. at 315-317). He was encouraged to exercise and to stop smoking.

On December 16, 2009, plaintiff was seen for an unrelated issue and was told to stop smoking (Tr. at 325).

On January 6, 2010, plaintiff saw the prison doctor and denied depression (Tr. at 330-333).

On March 2, 2010, plaintiff saw the prison doctor and was prescribed Gabapentin (for nerve pain) (Tr. at 341).

On March 11, 2010, plaintiff saw the prison nurse and complained of fluttering in his chest on activity and recent severe cramps in his legs at night (Tr. at 342-343). He was listed as a smoker of one pack per day. He was encouraged to exercise and to stop smoking. He saw the doctor that day and was assessed with hypertension under good control (Tr. at 343-346). The doctor prescribed an aspirin a day and Lisinopril (for hypertension), he encouraged exercise and he recommended that plaintiff stop smoking.

Later that month plaintiff was released from custody. During his period of incarceration, he saw the nurse and doctor on many occasions for things such as sinus infections or toothaches, but no further mention of his allegedly disabling impairments appear in those records.

The month after plaintiff was released from custody, on April 27, 2010, he was seen by Brett Young, a social worker at Behavioral Health Care (Tr. at 395-398). Plaintiff came to his appointment alone. His chief complaint was back pain. Plaintiff told Mr. Young that he had been sent to prison because he had a DWI and then was in a car wreck. He also reported "bad anxiety" and said he could not work anymore because he was not able to function like he previously could. Plaintiff reported having been an alcoholic for 15 years but said his last

drink was in December 2007 -- "the night of the accident." Plaintiff reported having used marijuana and methamphetamine in years past. He reported overuse of Naproxen about six months earlier.

At the time of this visit plaintiff was taking Tramadol (treats pain), Flexeril (muscle relaxer) and hypertension medication. Plaintiff described his pain as a 6/10 at both its best and its worst. Plaintiff continued to smoke a pack of cigarettes a day. Under activities of daily living, Mr. Young wrote, "Darren is able to fully care for self."

Mr. Young performed a mental status exam and noted that plaintiff was casually dressed with adequate hygiene, he was calm and cooperative, his speech was normal and his behavior appropriate, his judgment and insight were normal, thought process was normal, memory was intact, attention and concentration were "good 90% on task". His intellect was average. The only abnormal observation was that plaintiff's mood was anxious. He was assessed with generalized anxiety disorder, alcohol dependence in remission, drug abuse by history, and problems with economic, legal, social environment, and other psychosocial problems. He had a GAF of 48-50. "A diagnosis of Generalized Anxiety Disorder was given due to symptoms described."

Two days later, on April 29, 2010, plaintiff filed an application for Social Security disability benefits.

The following day, on April 30, 2010, plaintiff sought treatment for his neck and back pain at Ozarks Medical Center (Tr. at 466-467). He was noted to be a heavy smoker. His upper and lower extremities were normal. He complained of back pain and tenderness. He was assessed with chronic back pain, hypertension and chronic obstructive pulmonary disease. The doctor noted that plaintiff had a current prescription for Tramadol and told plaintiff to use Tylenol or Ibuprofen until it was time to renew his prescription, which appears to indicate that

plaintiff was taking more of his prescription medication than was prescribed.  Plaintiff was told to keep his psychiatric appointment on June 16, 2010, not to do any heavy lifting, and to stop smoking.  He was told to return in three months.  There are no records for any psychiatric appointment on June 16, 2010.  Plaintiff did not seek medical treatment again for the next five months.

On June 7, 2010, plaintiff had an hour of individual psychotherapy with Josh Heselton, MSW, at Behavioral Health Care (Tr. at 407-408).  Plaintiff was on time, casually dressed, and adequately groomed.  His mood was depressed and anxious.  Plaintiff reported constant back pain which he rated a 7/10 both at its best and its worst.  Mr. Heselton assessed a GAF of 48-50 and told plaintiff to return in four to six weeks for continued therapy.  Plaintiff did not return for further therapy.

On September 23, 2010, plaintiff saw Jose Atiles, M.D., for back pain (Tr. at 452-454).  He continued to smoke a pack of cigarettes per day.  Plaintiff was taking Tramadol for pain and hypertension medication.  His judgment and insight were normal, he was oriented times three, and his recent and remote memory were intact.  Dr. Atiles assessed depression and back pain, and he prescribed Trazodone (anti-depressant) and Darvocet[1] (narcotic).

A CT scan of the thoracic spine performed on October 20, 2010, indicated a superior end plate compression fracture of T3 with up to one-third loss of vertebral body height (Tr. at 456).  "This is probably old considering the lack of surrounding soft tissue swelling."  A CT scan of the lumbar spine performed on the same date indicated that the severe burst compression fracture which occurred in December 2007 had "since healed", that he had encroachment on the anterior margin of the central spinal canal at L3-4 due to mild disc

---

[1]Darvocet was removed from the U.S. market two months later, in November 2010.

bulging, and mild encroachment of the L4 neural foramina (Tr. at 458-459). A CT scan of the cervical spine was normal (Tr. at 457).

On November 5, 2010, plaintiff saw Dr. Atiles for back pain and sinus pain (Tr. at 444-445). Plaintiff's judgment/insight, recent/remote memory, and mood/affect were normal. He was oriented times three. Dr. Atiles assessed back pain and prescribed Flexeril (muscle relaxer), and Naprosyn (non-steroidal anti-inflammatory).

On November 30, 2010, plaintiff saw Dr. Atiles for back and neck pain (Tr. at 442-443). Plaintiff's strength, tone and range of motion was normal in his back/spine and extremities. He had a broad-based gait. He was oriented times three, his mood and affect were appropriate, his judgment and insight were normal, and his recent/remote memory was intact. Dr. Atiles performed trigger point injections and prescribed Tramadol (for pain), Trazodone (antidepressant used to treat insomnia), and Skelaxin (muscle relaxer). Because Darvocet had been taken off the market by now and Dr. Atiles did not prescribe a substitute narcotic, he clearly believed that non-narcotic pain medication was sufficient to control plaintiff's symptoms.

Two weeks later, on December 14, 2010, plaintiff began seeing Richard Tompson, M.D., for lower back pain (Tr. at 431-435). Plaintiff said that his pain is aggravated by prolonged sitting/walking and twisting. It is alleviated with rest. He complained of numbness in his right leg and weakness in both legs. "Patient reported ability to perform ADLs [activities of daily living] is greatly limited by pain." Plaintiff reported that he had previously tried physical therapy, home exercises, chiropractic manipulation, ice/heat therapy, muscle relaxers and anti-inflammatories with little or no benefit. Although plaintiff reported no benefit from Skelaxin or Tramadol, Dr. Tompson noted that plaintiff's Medicaid records showed that he had recently refilled both of those medications.

11

Plaintiff reported getting Clonazepam from a friend. Clonazepam treats anxiety and is a controlled substance. Plaintiff also reported having gotten Vicodin (another controlled substance, a narcotic) from a friend the day before.

Plaintiff reported that he continued to smoke a pack of cigarettes per day. He reported his last use of marijuana as having occurred in 1980, and he reported no illicit drug use, no methamphetamine use, and no alcohol use -- all untrue. He reported exercising once or twice a week and said he was pursuing disability. Plaintiff's subjective complaints included the following: poor sleep, excessive daytime sleepiness, confusion, morning headaches, impaired memory, impaired intellectual functioning, muscle cramps, joint pain, joint swelling, joint stiffness, migraines, numbness and tingling, leg weakness, depression, high stress level, weird dreams, cold intolerance, excessive urination, and average pain a 4 or 5 out of 10.

Objectively, Dr. Thomson observed that plaintiff was in no apparent psychiatric distress, he was pleasant and interacting appropriately, and he was calm. He was well groomed and well nourished, he was alert and oriented times three, he expressed full and free-flowing thoughts, his perceptions were realistic and consistent with the doctor's, and he expressed sound and rational answers to questions.

Straight leg raising was negative bilaterally. Plaintiff had mild low lumbar spinal tenderness and paraspinous tenderness. He had pain with lumbar spine range of motion. His motor strength was normal.

Dr. Thomson stopped plaintiff's Skelaxin (muscle relaxer) and Tramadol (treats pain) and instead prescribed Tizanidine as needed for spasms and Norco (narcotic). "Patient was advised that use of illicit drugs (including marijuana, other street drugs, prescription drugs not disclosed, and prescription drugs belonging to other person) will result in dissolution of treatment. Patient also advised that misuse of prescription drugs (including sharing prescribed

medications with other persons and inappropriate self-dosing) will result in dissolution of treatment."

On January 11, 2011, plaintiff had a follow-up with Dr. Tompson (Tr. at 428-430). Plaintiff reported that his symptoms were unchanged since the last visit. He reported that his ability to perform activities of daily living were greatly limited by pain. Plaintiff said his medication was not helping much and he requested that Dr. Tompson prescribe something different. Plaintiff reported that his pain averaged a 4 to 5 out of 10. Dr. Tompson observed that plaintiff was in no apparent distress, he was pleasant and interacting appropriately and he was calm. He was alert and conversant. Dr. Tompson increased plaintiff's dosage of Norco, a narcotic, and he substituted Baclofen for Tizanidine for plaintiff's spasms.

On February 4, 2011, plaintiff saw Celeste Williams, a nurse practitioner in Dr. Atiles's office, for a follow up on his hypertension (Tr. at 439-440). Plaintiff reported that he forgets to take his hypertension medication at times and had been out of it for ten days. His musculoskeletal/pain review of systems was noted to be normal. His Lisinopril was refilled.

On February 8, 2011, plaintiff saw Dr. Tompson for a two-month medication visit (Tr. at 425-427). Plaintiff reported no change since his January 11, 2011, visit. He rated his pain an average of 1-2 with his pain being a 1 at best and a 3 at worst. Dr. Tompson observed that plaintiff was in no apparent distress, he was pleasant and interacting appropriately, and he was calm. He was well groomed, he was alert and conversant. His gait was broad-based. No further abnormalities were noted. Dr. Tompson continued plaintiff's same medications.

On April 4, 2011, plaintiff saw Michael Ball, D.O., complaining of back pain and "trying to get disability. Sees Dr. Thompson [sic] [for] pain management, going thru Dan Parmele [disability attorney]." Everything in plaintiff's exam was normal except his back, extremities and "neurological." Those items were marked abnormal, but no further

13

elaboration was included. Dr. Ball assessed lumbar pain and thoracic pain. He provided no plan of care, and he prescribed no medication.

On April 6, 2011, plaintiff saw Dr. Tompson for a follow up (Tr. at 480-482). Plaintiff reported no changes in his symptoms since February 8, 2011. He rated his pain an average of 4 to 5. He was observed to be pleasant and interacting appropriately, he was calm, well groomed, alert and conversant. The only abnormal finding was a broad-based gait. Dr. Tompson increased plaintiff's dose of Norco (narcotic) and stopped his Tramadol (for pain), and he counseled plaintiff regarding violations of the treatment agreement including accepting prescriptions from another provider and taking medication from an old prescription.

On April 14, 2011, plaintiff returned to see Dr. Ball for a follow up, "said doing the same" (Tr. at 473). Dr. Ball marked everything in plaintiff's exam normal, including his back. This time he did not assess plaintiff's extremities or "neurological" which were both marked abnormal two weeks earlier. This time Dr. Ball assessed headaches, but again he provided no plan of care and wrote no prescriptions.

On May 2, 2011, plaintiff saw Dr. Ball for a follow up on his last appointment, and reported that he was "doing the same" (Tr. at 472). Everything that was examined was normal, but Dr. Ball did not assess plaintiff's back, extremities or "neurological", all of which had been marked abnormal a month earlier. Dr. Ball assessed lumbar pain, but provided no plan of care and no other treatment of any kind. On that day, he prepared a Medical Source Statement - Physical (Tr. at 462-463). He found that plaintiff could lift five pounds frequently and ten pounds occasionally, stand or walk for 15 minutes at a time and for a total of two hours per day, sit for 15 minutes at a time and for a total of two hours per day, and was limited in his ability to push or pull. He found that plaintiff should never climb, stoop, kneel, crouch, crawl, reach, or handle, but that he could occasionally balance. He found that plaintiff should

14

avoid any exposure to extreme heat or cold, hazards or heights, and that he should avoid moderate exposure to weather, wetness, humidity, dust, fumes, and vibration. He found that plaintiff needs to lie down for an hour at a time every two hours.

On May 4, 2011, plaintiff saw Dr. Tompson for a follow up on neck and back pain (Tr. at 476-479). Although plaintiff had been told by Dr. Tompson to bring his medication with him at each visit or risk termination of treatment, plaintiff did not bring his medication on this visit but claimed it was in storage due to a recent move. He did, however, claim to be getting good benefit from his narcotic pain medication. Dr. Tompson noted that plaintiff had obtained narcotics from another provider on April 6, 2011; had failed to bring his prescribed medication to his appointment for a pill count on May 4, 2011; had obtained narcotics from another individual on May 4, 2011; and had taken unprescribed medication on April 6, 2011, all in violation of the treatment agreement. Under review of systems, it was noted that plaintiff had no changes since his last visit. His average pain was a 3, and his worst pain was a 4. He was described as pleasant and interacting appropriately, and he was calm. He was well groomed, alert and conversant. The only abnormal finding was a broad-based gait. Dr. Tompson refilled plaintiff's medications and counseled him on violations of the treatment agreement. "[F]uture violation of treatment agreement will result in dissolution of treatment."

On June 13, 2011, plaintiff was seen as a new patient by Dr. Philip Loyd[2] after having been referred by Dr. Thomson (Tr. at 500-506). In his initial paperwork, plaintiff was to check all of the items "that apply to you now and in the past." He did not check anxiety/stress or insomnia. Plaintiff reported continuing to smoke a pack of cigarettes a day. He reported

---

[2]Dr. Loyd was with Cherry Health Center which specializes in chiropractic, physical therapy, rehabilitation and massage therapy (Tr. at 500).

that he does not consume alcohol and that he does not have a history of substance abuse, both untrue.

In his activities of daily living evaluation, plaintiff reported that he needs frequent assistance with preparing meals or eating, bathroom needs and bathing, and getting dressed. He seldom needs assistance walking or climbing stairs. Plaintiff's condition frequently causes him to stay in bed or rest on the couch, cancel work or home duties, and lose sleep during the night. He regularly needs assistance getting up or down. He seldom loses his balance. He constantly has symptoms when lifting, pushing or pulling 20 pounds or more. He frequently has symptoms when exercising, walking or stretching. He constantly has symptoms when sitting or riding in the car for long periods.

Despite having previously admitted to being an alcoholic for 15 years, plaintiff did not check "drug/alcohol abuse" as a condition he has ever had (Tr. at 504). He circled "no" when asked about both alcohol and illicit drugs. He admitted to continued smoking.

His psychiatric exam was "appropriate" (Tr. at 505). No tenderness or spasms were noted. He had reduced range of motion in his lumbar spine, but no further abnormal findings were noted. Under special instructions, a nurse practitioner wrote, "Pt has pain with walking/standing more than 10 minutes." An MRI and x-rays were requested, and the nurse practitioner recommended a chiropractic evaluation and physical therapy evaluation.

That same day, plaintiff had x-rays taken by Doran Nicholson, a chiropractor (Tr. at 499). Dr. Nicholson observed the severe compression fracture of L4 which had been stabilized through a pedicle screw fusion of L2 through S1. "The remaining lumbar vertebrae are of good height." Plaintiff had considerable thinning of those discs affected by the screw fusion. His pelvic structures were intact with the joints of the pelvis being normal. Plaintiff's lumbar range of extension was severely limited.

On June 18, 2011, Joseph Gaeta, M.D., an agency medical expert, reviewed plaintiff's medical records at the request of the ALJ (Tr. at 484-488). Dr. Gaeta found that there was insufficient medical evidence to show that plaintiff had an impairment resulting from anatomical, physiological, or psychological abnormalities. "Neck, back pains - no significant findings by x-ray or by physical examinations."

## C.  SUMMARY OF TESTIMONY

During the June 21, 2011, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

### 1.  Plaintiff's testimony.

Plaintiff was 47 years of age at the time of the administrative hearing (Tr. at 27). He was 5'9" tall and weighed 135 pounds (Tr. at 27). He has a GED which he earned in 2006 (Tr. at 27). Plaintiff is divorced and has a daughter who lives with him and her mother to whom plaintiff is engaged (Tr. at 28). They live in a cabin in the woods (Tr. at 35). Plaintiff's fiancée does not work (Tr. at 35). She mostly takes care of their daughter (Tr. at 35). "It's hard for me to, I've tried changing her, but even at that I have to raise her up or something or try to slide the diaper under her." (Tr. at 35). Plaintiff's daughter is four years old (Tr. at 28).

Plaintiff smokes a pack of cigarettes per day (Tr. at 28).

Plaintiff has not worked since before December 24, 2007 (Tr. at 28). He was incarcerated for a while and was assigned work duties, but he was not able to do anything (Tr. at 28-29). In prison they assigned him a sit-down job -- he would hand out tennis shoes for a couple hours a day, and he could sit down or stand up (Tr. at 28).

Plaintiff used to have a driver's license but he no longer does (Tr. at 29). He cannot drive because he doesn't have a license and it hurts his back and his legs to drive (Tr. at 29). The pain from his lower back radiates into his legs, and it is constant (Tr. at 29-30). He takes

nine Vicodin pills a day and three back pills and muscle relaxers per day (Tr. at 30). That medication helps but does not stop the pain (Tr. at 30). His medication causes him to experience confusion, forgetfulness, tiredness, and depression (Tr. at 30). There are days when he has difficulty getting out of bed because of his depression (Tr. at 30). That happens about ten days a month (Tr. at 30).

Plaintiff can shower, but he needs help putting on his pants, shoes and socks because of the pain (Tr. at 30). Sometimes he puts those things on himself because no one else is around, but it hurts (Tr. at 31).

Plaintiff has constant tightness in his neck and headaches (Tr. at 31). "This has been going on for the bigger part of my life." This pain has gotten worse and it radiates into his shoulder blades (Tr. at 31). If he raises his arms and turns his neck, it pops and he will have a headache that lasts for up to two weeks (Tr. at 31). Plaintiff spends about half his day lying down or reclining due to his back pain (Tr. at 31). He can sit for about 20 minutes at a time, he can stand for about 10 minutes at a time (Tr. at 31-32). It hurts to lift a milk carton, and if his trash has anything more than paper in it "it gets to me" (Tr. at 32). If plaintiff lifts or carries anything with one arm, he has pain in his neck and between his shoulder blades, and it could bring on a headache (Tr. at 32).

Plaintiff has such severe anxiety that he cannot sleep (Tr. at 33). He tosses and turns which causes his back to hurt for several days (Tr. at 33). He has been prescribed Trazodone which helps but sometimes does not work (Tr. at 33). Thinking too much about his problems -- i.e., not being able to work anymore to take care of his family -- triggers his anxiety (Tr. at 33).

Plaintiff takes walks with his daughter two to three times a day (Tr. at 33). They can walk 10 to 15 minutes at a time (Tr. at 33). He helps pick up stuff around the house (Tr. at

33). He cannot pick up things off the floor, but he can clean off counters and tables, scrape dishes and wash them (Tr. at 33-34). Some days he cannot complete tasks because of sharp pain (Tr. at 34). He is always distracted by his severe pain (Tr. at 34). "It's real bad pain. It's about as worse pain as I could imagine I would ever have to go through. It's all the time and sometimes it's real bad. Sometimes I can't eat from it. It makes me sick. It gets so bad that I'll get sick to my stomach. It's even made me throw up just from pain making me sick." (Tr. at 34). Despite having described that pain as being "all the time" plaintiff then testified that this type of pain happens about once a month (Tr. at 34). Sometimes he forgets to take his medication, and that makes the pain worse and it is harder to get it under control (Tr. at 34-35). Although plaintiff needs someone to remind him to take his medicine, that person forgets to remind him (Tr. at 35).

## 2. Vocational expert testimony.

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical involved a person who can lift 20 pounds occasionally and 10 pounds frequently; stand for six hours; sit for six hours; occasionally climb stairs; never climb ropes, scaffolds or ladders; occasionally stoop, bend, crouch, and crawl; should avoid unprotected heights and hazardous fumes; and should be limited to jobs that do not entail detailed or complicated instructions (Tr. at 37). Such a person could not perform any of plaintiff's past relevant work (Tr. at 37). The person could work as a bindery machine feeder, DOT 653.686-026, with 2,200 jobs in Missouri and 125,000 in the country; a folding machine operator, DOT 369.686-010, with 275 in Missouri and 27,500 in the country; or a molded frame assembler, DOT 713.684-014, with 140 in Missouri and 12,500 in the country (Tr. at 37-38).

The second hypothetical added the restrictions that the person should never kneel, crouch, or crawl and would need to take breaks throughout the day to lie down (Tr. at 38).

Such a person could not work (Tr. at 38).

The third hypothetical was the same as the first except the person could never stoop, kneel, crouch or crawl (Tr. at 38). The vocational expert testified that "those factors would not be any greater than what would be expected in daily normal living activities. If a person could never kneel, stoop or crouch, they would probably need attendant care" and would not be able to work (Tr. at 38).

The fourth hypothetical was the same as the first except the person would need a non-captive portioning with the alternative sitting and standing every 15 minutes (Tr. at 38). The person could not work (Tr. at 38).

The fifth hypothetical involved a person who had a loss of production due to lack of concentration resulting in 15% loss of production (Tr. at 39). The vocational expert testified that such a person could work, but would be right on the edge -- any further loss of production would eliminate the person from competitive employment (Tr. at 39).

The sixth hypothetical was the same as the first except the person would also be limited to only occasional reaching in all directions (Tr. at 39). Such a person could not work (Tr. at 39).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Michael Shilling entered his opinion on July 15, 2011 (Tr. at 9-18).

Step one. Plaintiff has not engaged in substantial gainful activity since April 29, 2010, his application date (Tr. at 11).

Step two. Plaintiff suffers from the following severe impairments: degenerative disc disease of the lumbar spine status post surgery, generalized anxiety disorder, depression, and

alcohol abuse (Tr. at 11). All other impairments alleged by plaintiff were determined to be nonsevere (Tr. at 11).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11-12).

Step four. Plaintiff retains the residual functional capacity to perform light work in that he can lift and carry 20 pounds occasionally and 10 pounds frequently; he can walk and stand for 6 hours per day; he can sit for 6 hours per day; he can occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl; he can never climb ladders, ropes or scaffolds; he must avoid unprotected heights and hazardous moving machinery; and he is limited to jobs that do not demand attention to details, complicated job tasks, or complicated instructions (Tr. at 12-13). With this residual functional capacity, plaintiff is unable to perform any of his past relevant work which consists of auto body repairer (medium, skilled, SVP of 7), spray painter (medium, unskilled, SVP of 2), and laborer (medium, semiskilled SVP of 3). (Tr. at 13-16).

Step five. Plaintiff was a younger individual at the time he filed his application, he has a high school education and is able to communicate in English (Tr. at 16). Considering plaintiff's age, education, work experience, and residual functional capacity, he can work as a bindery machine feeder, folding machine operator, and molded frame assembler, all available in significant numbers (Tr. at 17).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a

whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The objective evidence shows the claimant has both physical and mental health impairments. However, for the reasons discussed further below, the objective evidence

does not support the claimant's allegations regarding the limitations imposed by his impairments.

The objective evidence shows the claimant has some degeneration in his lumbar spine. However, the results of the October 2010 CT scan generally showed only mild to moderate degeneration. Furthermore, the results did not show that the claimant had any nerve root impingement. The moderate findings do not fully support the claimant's allegation regarding the intensity of his back pain.

The record shows the claimant has consistently sought medication treatment from Dr. Tompson. However, there is no indication that he underwent any additional treatment for his lower back pain. . . .

The objective medical findings by the treating physicians did not include significant deficits in strength, neurological function, range of motion, posture, sensation, reflexes, pulses or gait. In addition, the objective medical findings by treating physicians did not include significant deficits in the claimant's abilities to squat, stand, walk, sit, lift, carry, bend or stoop. There is no medical evidence that the claimant was prescribed, or determined to require, the prolonged use of an assistive device such as a cane or brace for the purpose of ambulation, motion, or immobilization. This lack of objective findings significantly detracts from the credibility of the claimant's allegations regarding his need to lie down frequently during the day.

The record shows the claimant sought a very minimal amount of mental health treatment. He was seen for individual therapy on one occasion and for medication management on one occasion. This suggests his mental impairments are not as severe as he now alleges and detracts from his credibility.

The medical treatment notes do not document any medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits with respect to the claimant's mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, activities of daily living, speech, or psychomotor activity. In addition there is no evidence the claimant has any significant deficits with his focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, abilities to understand and follow instructions, judgment, insight, cognitive function or behavior. This lack of evidence weighs against the claimant's allegations regarding his anxiety and depression.

The claimant testified that he is not capable of performing many tasks on a daily basis. He reported that he might scrape off some dishes, but otherwise he does very little housework. The undersigned finds that the near-sedentary existence which the claimant described at the hearing is shown by the overall record to be self-imposed, rather than being the result of any totally disabling impairment or combination of impairments. Neither the objective medical evidence, nor the testimony of the claimant, establishes that the claimant's ability to function has been so severely impaired as to preclude all types of work activity.

A review of the claimant's earnings record shows he has a poor work history. Since 2000, the claimant has had earnings above the SGA level for only one year. There are several years the claimant had no reported earnings. He has offered no explanation for such low earnings. Such lack of earnings suggests that the claimant may have already had a reduced motivation to work that is unrelated to his current medical impairments.

(Tr. at 15-16).

Plaintiff specifically argues that the ALJ's credibility analysis is flawed because he relied on plaintiff's moderate, conservative treatment for his lower back pain, he fails to consider the objective evidence which supports plaintiff's testimony regarding limited daily activities, and he improperly considered plaintiff's work history.

## 1.  PRIOR WORK RECORD

As the ALJ noted, plaintiff has a poor work record. Plaintiff's lifetime earnings amount to $79,415.71. This averages out to annual earnings of only $2,647.19 per year for the entire 30 years spanning his first year of earned income through his alleged onset of disability. During eleven of those years plaintiff had no earnings whatsoever, and this is prior to his alleged onset date. Plaintiff claims that "[t]he ALJ failed to mention that, in many of those years, Dooms was incarcerated. Therefore, Dooms' work history is not necessarily indicative of a person who has a reduced motivation to work, unrelated to medical impairments." Contrary to plaintiff's assertion, the record establishes that plaintiff was incarcerated only AFTER his alleged onset date. There is no evidence in this file that plaintiff was incarcerated for "many years" or that it had any impact at all on his poor work history since it occurred after plaintiff claims his impairments precluded employment. Plaintiff's earnings history clearly supports the ALJ's finding that plaintiff's subjective complaints that disabling symptoms keep him from working are not credible.

## 2.    *DAILY ACTIVITIES*

Plaintiff did not complete any of the daily activities questionnaires or function reports normally associated with a disability case.  Although he alleged severe limitations to Dr. Loyd's office, those severe limitations conflict with plaintiff's own hearing testimony and Dr. Loyd's records show that plaintiff was not truthful when filling out the paperwork (i.e., he reported that he had no history of alcohol or illicit drug use).  There is no other evidence of plaintiff's daily activities in the record.  Plaintiff argues that Dr. Ball's findings (discussed below) support his allegations of inability to perform most activities of daily living.  Plaintiff refers to Dr. Ball's opinion as "objective findings."  However, as discussed more fully below, Dr. Ball's opinion is devoid of credibility and does not support anything.

## 3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

In plaintiff's medical records he reported his average pain on a scale of 1 to 10 as follows:

April 27, 2010 - 6

June 7, 2010 - 7

December 14, 2010 - 4 or 5

January 11, 2011 - 4 or 5

February 8, 2011 - 1 or 2

April 6, 2011 - 4 or 5

May 4, 2011 - 3

Plaintiff has been treated with medications which have varied only slightly in prescription or dose.  On plaintiff's initial visit with Dr. Tompson, he reported that he had previously tried physical therapy, home exercises, chiropractic manipulation, ice/heat therapy, muscle relaxers and anti-inflammatories with little or no benefit.  There is no medical evidence

that has been presented by plaintiff showing that he tried physical therapy, chiropractic manipulation, ice therapy or heat therapy.  Dr. Tompson made note of plaintiff's allegation during this visit that his prescriptions for muscle relaxers and anti-inflammatories had been of no help, yet plaintiff's Medicaid records showed that he had recently refilled those medications.  And on this visit plaintiff reported having recently taken two different controlled substances that he had allegedly gotten from others.

The record reflects that plaintiff did not comply with medical suggestions to stop smoking (clearly an important factor in how well one heals after back surgery).  He was told by his treating physicians on many occasions to engage in regular exercise.  He was warned multiple times by his treating physician about his drug-seeking behavior which could lead to termination of the treatment relationship, and he lied on medical reports thereafter by stating that he had no history of drug or alcohol abuse when in fact his history of each was significant.

Plaintiff's allegations of severe symptoms have typically been reserved for the doctors who saw plaintiff in connection with his disability claim.  On April 27, 2010, plaintiff told Brett Young that he could fully care for himself.  Just over a year later and shortly before his administrative hearing, plaintiff claimed to a nurse in Dr. Loyd's office that he needs frequent assistance with preparing meals or eating, bathroom needs and bathing, and getting dressed. This is despite the fact that during his other medical appointments during that year it was consistently noted that there had been "no change" since his previous appointment.  Further, when plaintiff told Dr. Tompson that he was pursuing disability, he named off a myriad of symptoms, none of which were observed by Dr. Tompson.  Specifically plaintiff reported poor sleep, excessive daytime sleepiness, confusion, morning headaches, impaired memory, impaired intellectual functioning, muscle cramps, joint pain, joint swelling, joint stiffness, migraines, numbness and tingling, leg weakness, depression, high stress level, weird dreams,

cold intolerance, excessive urination, and average pain a 4 or 5 out of 10. Dr. Tompson observed that plaintiff was in no apparent psychiatric distress, he was pleasant and interacting appropriately, and he was calm. He was well groomed and well nourished, he was alert and oriented times three, he expressed full and free-flowing thoughts, his perceptions were realistic and consistent with the doctor's, he expressed sound and rational answer to questions. Straight leg raising was negative bilaterally. Plaintiff had only mild tenderness in his back. His motor strength was normal.

And finally, plaintiff's own treating physician, Dr. Ball, never provided any treatment at all, not so much as a recommendation to take over-the-counter medication. One can assume that had Dr. Ball believed plaintiff's symptoms were serious enough to merit treatment, he would have administered some.

This factor supports the ALJ's credibility finding.

**B.      *CREDIBILITY CONCLUSION***

The record reflects that plaintiff lied many times on his medical records, he took controlled substances that were not prescribed to him, he continued to smoke despite having been told by every treating doctor to stop, he overused prescription medications, and he reported significantly greater symptoms after having filed his application for disability benefits -- symptoms which were not observed by any medical professional or supported by the x-rays, MRIs, other scans, or examinations. By the month after plaintiff's accident, he was noted to be doing well and walking without difficulty. He had no medical treatment during the entire next year. He had only one therapy session for his alleged mental impairment, and none of his alleged mental deficiencies were observed by medical providers.

I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VII.    OPINION OF DR. BALL

Plaintiff argues that Dr. Ball's opinion in the Medical Source Statement -- finding that plaintiff could sit, stand and walk for a total of four hours per day; that he would have to lie down for an hour at a time every two hours during the day; and that he could never kneel, stoop or crouch -- should have been given controlling weight. In support, plaintiff argues that "Dr. Ball is a treating physician. . . . Dr. Ball's opinions are supported by his treatment notes. . . . [O]ther evidence of record supports Dr. Ball's opinion."

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

Dr. Ball is hardly a treating physician. He saw plaintiff three times and provided absolutely no treatment.

On April 4, 2011, plaintiff saw Dr. Ball for the first time. The records state that he was "trying to get disability" and was "going thru Dan Parmele", a disability attorney. Everything in plaintiff's exam was normal except his back, extremities and "neurological." Those items

were marked abnormal, but no further elaboration was included. Dr. Ball assessed lumbar pain and thoracic pain He provided no plan of care, he prescribed no medication, he provided no treatment whatsoever.

On April 14, 2011, plaintiff told Dr. Ball he was "doing the same." Dr. Ball marked everything in plaintiff's exam normal, including his back. This time he did not even assess plaintiff's extremities or "neurological" which were both marked abnormal two weeks earlier. Dr. Ball assessed headaches, but he provided no plan of care and wrote no prescriptions.

On May 2, 2011, plaintiff saw Dr. Ball and said he was "doing the same." Everything that was examined was normal. Dr. Ball did not even assess plaintiff's back, extremities or "neurological", all of which had been marked abnormal a month earlier and which are the source of plaintiff's alleged disability. Dr. Ball assessed lumbar pain, but provided no plan of care and no treatment of any kind.

Dr. Ball performed no tests at all. There is no evidence that he reviewed any of plaintiff's medical records from other providers. And importantly, plaintiff continued to see and be treated by Dr. Tompson during this time, lending support to the suggestion that Dr. Ball was not seen for treatment at all but for the sole purpose of obtaining a Medical Source Statement for plaintiff's disability case.

Additionally, despite the fact that Dr. Ball assessed plaintiff as a bed-ridden individual who would likely need attendant care,[3] all of plaintiff's treating doctors encouraged him to get regular exercise.

There is no support whatsoever in this record for the opinion of Dr. Ball, and the ALJ did not err in failing to give it controlling weight.

---

[3]The vocational expert testified that if a person could never kneel, stoop or crouch (as found by Dr. Ball), he would probably need attendant care.

## VIII. CONCLUSIONS

Plaintiff's final argument is that the ALJ's residual functional capacity assessment is not supported by substantial evidence. I have read plaintiff's argument and find it to be without merit. The ALJ thoroughly discussed the evidence in this case, provided credibility determinations for the evidence, and based his residual functional capacity assessment on all of the credible evidence of record.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 23, 2014